**CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA v. | Docket No. |
|---|---|
| ERIC LAMAR WELLS | MAGISTRATE'S CASE NO. SA 12-00177 M |

Complaint for violation of Title 18  United States Code § 1591 (a)

| NAME OF MAGISTRATE JUDGE JEAN P. ROSENBLUTH | UNITED STATES MAGISTRATE JUDGE | LOCATION Santa Ana, CA |
|---|---|---|

| DATE OF OFFENSE April 22, 2012 | PLACE OF OFFENSE Anaheim, CA | Address of ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

See attached affidavit which is incorporated as part of this Complaint

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

MAY - 2 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

See attached affidavit which is incorporated as part of this Complaint

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT /s/ |
|---|---|
| | SPECIAL AGENT Steven C. Wrathall Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)  **JEAN P. ROSENBLUTH** | DATE May 2, 2012 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA: MPT:em

<u>A F F I D A V I T</u>

I, Steven C. Wrathall, being duly sworn, do hereby depose and state:

## I.  <u>INTRODUCTION</u>

1.  I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and I have been so employed since approximately February 2009.  During my training and experience as a SA, I have experience and have received instruction on writing search warrant affidavits and gathering information for the determination of probable cause.  I am currently assigned to investigate the sexual exploitation of children in the Central District of California as part of the Southern California Innocence Lost ("SOCAIL") Task Force.  The SOCAIL Task Force is responsible for enforcing federal criminal statutes involving the sexual exploitation of children under Title 18, United States Code, Section 1591(a) <u>et</u> <u>seq</u>.

2.  The statements contained in this affidavit are based upon my training and experience, information provided to me by other investigators, other law enforcement officers, and witnesses as part of this investigation.  Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not attempted to include each and every fact known to me or other law enforcement personnel concerning this investigation.  I have set forth only those facts that I believe

1

are necessary to establish probable cause for the requested warrants.

## II.  <u>PURPOSE OF AFFIDAVIT</u>

3.  This affidavit is made in support of a criminal complaint and arrest warrants for ERIC LAMAR WELLS ("WELLS") and TONISHA ALECIA MOORE ("MOORE"), charging them with a violation of 18 U.S.C. § 1591(a) (Sex Trafficking of Children).

4.  This affidavit is also made in support of a search warrants authorizing the search six digital devices specified below for evidence and instrumentalities of violations of 18 U.S.C. § 1591(a) (Sex Trafficking of Children); 18 U.S.C. § 1594(a) (conspiracy); and 18 U.S.C. § 2423 (Transportation of Minors).

## III.  <u>DIGITAL DEVICES TO BE SEARCHED</u>

5.  The digital devices, as set forth in Attachment A, are currently stored in a secured room at the Anaheim Police Station, 425 South Harbor Boulevard, Anaheim, California 92805, and are described as follows (hereinafter "SUBJECT ITEM(S)"):

a.  Acer Aspire One Laptop, serial number LUSFS0D001143101207600;

b.  Toshiba Satellite Laptop, serial number 1B597109Q;

c.  Samsung SCH-R920 cellular telephone, serial number 99000028982677;

d.  Huawei M865 cellular telephone, serial number T8U9MA1222014487;

    e.    AT&T cellular telephone, serial number

Q4V7NB11C2604079; and

    f.    Samsung Cricket cellular telephone, serial number

268435460704060560.

### IV.   PROBABLE CAUSE

A.   Facts Pertaining to the Case

    6.    On April 23, 2012, I received a telephone call from

Anaheim Police Department ("APD") Vice Sergeant Craig Friesen.

Friesen said that an APD patrol unit had recovered a 14 year old

victim of prostitution, hereinafter referred to as MINOR #1.

MINOR #1 was taken back to the police department to be further

interviewed by APD Vice Investigators.

    7.    APD Investigators interviewed MINOR #1 and learned the

following:

    a.    MINOR #1 and another 17 year old minor,

hereinafter referred to as MINOR #2, were working as prostitutes

in the Las Vegas area.

    b.    On or about April 16, 2012, MINOR #1 and MINOR #2

were approached by an adult black male, later identified as

WELLS.  At first, they thought he was a "John" (term to describe

men who pay prostitutes in exchange for sex acts).

    c.    Through conversation, MINOR #1 and MINOR #2

learned that WELLS was not a John, but was in fact a "pimp" (term

used to describe a person who employees prostitutes) and he

wanted them to work for him.  MINOR #1 and MINOR #2 also learned

that WELLS already had an adult prostitute working for him, later identified as MOORE.

d.    WELLS and MOORE told MINOR #1 and MINOR #2 that they should be making approximately $500 dollars a day working as prostitutes.

e.    On or about April 16, 2012, WELLS, MOORE, MINOR #1, and MINOR #2 traveled from Las Vegas, Nevada to Phoenix, Arizona.  They stayed at the Quality Inn on Scottsdale Road. They traveled in a white, four door sedan, believed to be a Ford. All money from her work as a prostitute in Phoenix, Arizona was given to WELLS.

f.    On or about April 20, 2012, WELLS, MOORE, MINOR #1, and MINOR #2 traveled from Phoenix, Arizona to Anaheim, California, for the purpose of working as prostitutes.  They traveled in a white, four door sedan, believed to be a Ford.  On April 21, 2012, they stayed at the Motel 6 on Disney Way and on April 22, 2012, they stayed at a Travelodge on Beach Boulevard. All money from MINOR #1's work as a prostitute in Anaheim, California was given to WELLS.

g.    On April 23, 2012, WELLS, MOORE, and MINOR #2 left MINOR #1 at the Travelodge and MINOR #1 believed they were going to "work" in Los Angeles.  MINOR #1 was approached by the APD patrol unit while walking from the CVS to the Travelodge.  This area of Beach Boulevard is known to be an area where girls walk the street and work as prostitutes.

4

h.   MINOR #1 and MINOR #2 originally told WELLS that they were 18, but subsequently had conversations in front of him about MINOR #1 being 16 years old.  MINOR #1 and MINOR #2 also had conversations in front of MOORE where they stated that MINOR #1 was 16 and MINOR #2 was 17.

i.   While MINOR #1 was working as a prostitute in Phoenix and Anaheim, ads were posted on www.myredbook.com and www.backpage.com.  These websites are used for the solicitation of prostitution.  According to MINOR #1, the name "Fendi" was used for MINOR #1 and "Remii" was used for MINOR #2 when posting ads in Arizona.  In California, "Layla" was used for MINOR #2. The pictures in the ads were not of the girls, but were pictures taken from the internet.

j.   MINOR #1 knew the trues names of WELLS and MOORE, although WELLS sometimes goes by the name "Charlie".  MINOR #1 was able to positively identify WELLS and MOORE when shown photographs of each.

8.   I conducted searches of backpage.com and myredbook.com for the names "Fendi", "Remii", and "Layla" in the Phoenix, Arizona and Anaheim, California areas.  The following ads were found:

a.   On April 19, 2012 at 11:12 am, an ad titled "2 Girl Specials_Dangerous Curves!  Five Star Ser" was posted for the cities of Tempe, Phoenix, Mesa, and Avondale, AZ on myredbook.com.  The ad was listing two females by the names

5

"Fendi" and "Remii" for the price of $200 per hour.  The telephone number given was (xxx)xxx-xx04.

b.   On April 17, 2012 at 6:28 a.m., an ad titled "_((T_h_e_B_e_s_t__T_H_I_N_G__O_n_T_h_e_P_A_G_E_!!!)) SPECIALS start at $60 - 19" was posted for the city of Phoenix under the escorts section of backpage.com.  The name on the ad was "Fendi" and the telephone number given was (xxx)xxx-xx04.

c.   On April 20, 2012 at 2:02 p.m., an ad titled "2 Girl SPECIALS.....{SNEAK} {AWAY} {&} {COME} {PLAY} - 19" was posted for the city of Phoenix under the escorts section of backpage.com.  The names on the ad were "Remii" and "Fendi" and the telephone number given was (xxx)xxx-xx04.

d.   On April 23, 2012 at 9:37 a.m., an ad titled "((2)) NeW ExoTiC EbOnY VIXENS; 2 Girls - 19" was posted for the cities of Anaheim, Costa Mesa, and Irvine under the Orange County escorts section of backpage.com.  The names on the ad were "Fendi" and "Layla" and a telephone number of (xxx) xxx-xx58 was given.

9.   On April 23, 2012, I went to the Motel 6 in Anaheim, 100 West Disney Way, and inquired about rooms that were rented on April 20, 2012 under the name "WELLS".  There was a room rented for that night under the name "Edwin Wells".  The room was paid in cash.  Edwin Wells is the brother of WELLS.

6

10. It was learned that WELLS, MOORE, and MINOR #2 traveled in the white four door sedan to the Super 8 Motel located at 7216 55th Street in Sacramento, California.

11. On April 24, 2012, the SOCAIL Task Force located a white four door Ford Focus, bearing Arizona license plate "ANY0927" in the parking lot of the Super 8 Motel.

12. At approximately 11:30 a.m., MOORE and an unidentified black female (later identified as MINOR #2) approached the vehicle and got in. At this time, they were approached by the SOCAIL Task Force. Law enforcement knew that MOORE was on state probation subject to a search and seizure condition. MOORE gave consent to search the vehicle. During a search of the vehicle, law enforcement found the following: (1) a Toshiba Satellite Laptop (serial number 1B597109Q) in the trunk of the car; (2) a Samsung Cricket telephone (serial number 268435460704060560) in the driver's side door of the car; (3) a Samsung SCH-R920 cellular telephone (serial number 99000028982677) in MOORE's purse in the car; (4) a Huawei M865 cellular telephone (serial number T8U9MA1222014487) in MOORE's purse in the car.

13. It was learned that WELLS, MOORE, and MINOR #2 were staying at the Super 8 Motel and WELLS was currently in the room. MOORE gave consent to enter the room and WELLS was located.

14. The room was rented the night before to "Edwin Wells". A review of the surveillance footage showed that a person that matched the physical description of WELLS checked in for the

7

room.  It also showed WELLS, MOORE, and MINOR #2 walking through a hallway to and from the motel room.

15.  MOORE gave consent to search the room.  When asked whether law enforcement could search the room, WELLS stated he did not care.  Items that were seized from the room pursuant to consent given by MOORE and WELLS were the following: an Acer Aspire One laptop computer (serial number LUSFS0D001143101207600), a AT&T cellular telephone (serial number Q4V7NB11C2604079), receipts from motels in California and Arizona, clothing worn by WELLS that matched the video surveillance footage from check-in, and pre-paid Visa cards. Also located in the room was a California Driver's License for Edwin Wells.

16.  MINOR #2 told law enforcement that she traveled from Las Vegas, Nevada to Phoenix, Arizona, to Anaheim, California, to Sacramento, California with WELLS and MOORE.  She said that she gave them all the money that she made from working as a prostitute.  She also said WELLS and MOORE knew that she and MINOR #1 were under 18 years old.

17.  MOORE told me that she thought MINOR #1 was 16 years old and MINOR #2 was 18 years old.  She said WELLS knew MINOR #1 and MINOR #2 were under 18 years old as well.  Edwin Wells was never with them during any time when they traveled from Nevada to Arizona to California.  She also said WELLS was extremely nervous any time they saw law enforcement.  The always traveled in the

8

white four door sedan, which was a rental.   MOORE and WELLS have a daughter together.

18.   WELLS and MOORE were placed under arrest on state charges for pimping and pandering of minors under the age of 18.

B.   <u>Training and Experience Regarding Child Sex Traffickers' Use Of Digital Devices</u>

19.   Based on my training and experience, and information from other law enforcement personnel, I know the following regarding the practices and activities of persons engaged in violations of 18 U.S.C. § 1591(a) (Sex Trafficking of Children); 18 U.S.C. § 1594(a) (conspiracy); and 18 U.S.C. § 2423 (Transportation of Minors), and related commercial sex offenses:

a.   They typically use cellular telephones as the primary method of communication between the pimps and their "girls" (i.e., prostitutes) as well between the pimp and customers/clients of their commercial sex business.   Such communications are typically done via telephone calls and text messages.   They also utilize cellular telephones to take photographs of the "girls" and post them on the internet for on-line sex/prostitution advertisements, and to send the photos to potential clients/customers.

b.   They typically use laptop computers and similar devices to access the internet to post advertisements on websites such as myredbook.com and backpage.com, which are both websites that allow such persons to post classified-type advertisements

for sex-related services that they offer to third-parties. The advertisements typically post telephone numbers for customers and clients to contact the pimps or to contact their lead/bottom girls. They often store photographs or videos of their "girls" on laptops for their own personal possession. The laptops are also used to post such photographs on the internet and to send such photographs to potential clients/customers.

C.   <u>Training and Experience Regarding Digital Devices</u>

20.   As used below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data (excluding analog tapes such as VHS), and memory chips; and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that it is not always possible to search digital devices for digital data in a single day or even

over several weeks for a number of reasons, including the following:

    a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are many types of digital devices and software in use today that it takes time to conduct a thorough search.  In addition, it may also be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, software application or operating system that is being searched.

    b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

    c.    The volume of data stored on many digital devices will typically be so large that it takes substantial time to search such devices properly.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

　　　　d.　　Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

    e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of

13

USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

   f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

   i. The United States has not attempted to obtain this data by other means.

## V. ITEMS TO BE SEIZED

21. Based on the foregoing, I respectfully submit that there is probable cause to believe that the following SUBJECT ITEM(S), as stated in Attachment A, themselves constitute instrumentalities of the offense and should therefore be seized: Acer Aspire laptop, Toshiba Satellite laptop, Samsung cellular telephone, Huawei cellular telephone, AT&T cellular telephone, and Samsung Cricket cellular telephone.

22. Based on the foregoing, I also respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of 18 U.S.C. § 1591(a) (Sex Trafficking of Children); 18 U.S.C. § 1594(a) (conspiracy); and 18 U.S.C. § 2423 (Transportation of Minors), will be found on the SUBJECT ITEM(S):

a. Any records, documents, materials, and correspondence related to www.myredbook.com accounts;

b. Any records, documents, materials, and correspondence related to advertisements on www.backpage.com or any other website offering online classified advertisements;

c. Any records, documents, and correspondence related to the offering, requesting, soliciting, or transactions of any kind involving commercial sex acts, as defined in 18 U.S.C. § 1591(c)(1);

d. Address books, names, lists of names and addresses and any written correspondence or records containing information

about minors who may have been recruited, enticed, harbored, or transported for the purpose of engaging in a commercial sex act, as defined in 18 U.S.C. § 1591(c)(1);

e.  Address books, names, lists of names and addresses, and any other records, documents, or correspondence containing information about individuals that have requested, solicited, or entered into transactions of any kind involving commercial sex acts, as defined in 18 U.S.C. § 1591(c)(1);

f.  Any records, documents, photographs, videos, or other materials that identify or refer to ERIC LAMAR WELLS a/k/a "Charlie," or TONISHA ALECIA MOORE, or any other individual as the user of any of the SUBJECT ITEM(S) subject to search pursuant to this warrant;

g.  Visual depictions, photographs, images, or video of minors or young women who are unclothed, partially clothed, or posing in a manner that is sexually suggestive;

h.  Any records, documents, correspondence, or receipts related to the purchase or reservation of airline tickets, train tickets, bus tickets, or rental cars;

i.  Any records, documents, correspondence, or receipts related to the purchase, rental, or reservation of rooms at any hotel or motel;

j.  Personal telephone and address books, including names, telephone numbers, and any other information stored in numeric or alphabetic form in the telephone and address books;

16

k.   Documents, records, and other data reflecting incoming calls, outgoing calls, missed calls, length of calls, or other information describing calls made or received by the telephone, including specifically the telephone numbers called, received, or missed; and

l.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show the actual user(s) of the digital device during the time period between January 1, 2012 and the present.

21.   As used above in subparagraphs (a)-(l) of the foregoing paragraph, the terms records, documents, programs, applications, and materials include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.  As used both above and below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: [central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data

17

(excluding analog tapes such as VHS), and memory chips; and security devices.

5.    In searching the SUBJECT ITEM(S) and in searching digital data stored on the SUBJECT ITEM(S), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The team of law enforcement personnel, which may include the investigating agent(s), and/or individuals assisting law enforcement personnel searching the SUBJECT ITEM(S) shall complete the search as soon as is practicable but not to exceed 60 days from the date of the issuance of this warrant.  If additional time is needed, the government may seek an extension of this time period from the Court within the original 60 day period from the date of execution of the warrant.

b.    The team searching the SUBJECT ITEM(S) will do so only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The team may subject all of the data contained in the SUBJECT ITEM(S) capable of containing items to be seized as specified in this warrant to the protocols to

determine whether the SUBJECT ITEM(S) and any data falls within the items to be seized as set forth herein.  The team searching the SUBJECT ITEM(S) may also search for and attempt to recover "deleted," "hidden" or encrypted data to determine, pursuant to the protocols, whether the data falls within the list of items to be seized as set forth herein.

   ii.  The team searching the SUBJECT ITEM(S) also may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

   c.  When searching the SUBJECT ITEM(S) pursuant to the specific protocols selected, the team searching the SUBJECT ITEM(S) shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

   d.  If the team searching the SUBJECT ITEM(S) pursuant to the selected protocols encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT ITEM(S) pending further order of Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered , including how it was immediately apparent contraband or evidence of a crime.

   e.  At the conclusion of the search of the digital devices as set forth in subparagraph (a) above, any SUBJECT ITEM(S) determined to be itself an instrumentality of the offense(s) and all the data thereon shall be retained by the

19

government until further order of court or one year after the
conclusion of the criminal case/investigation.

      f.   Notwithstanding the above, after the completion of
the search of the SUBJECT ITEM(S) as set forth in subparagraph
(a) above, the government shall not access digital data falling
outside the scope of the items to be seized in this warrant on
any retained SUBJECT ITEM(S) or digital data absent further order
of court.

      g.   If the search team determines that any SUBJECT
ITEM(S) is not an instrumentality of any offense under
investigation and does not contain any data falling within the
list of items to be seized pursuant to this warrant, the
government will as soon as practicable return the SUBJECT ITEM(S)
and delete or destroy all the forensic copies thereof.

      h.   If the search determines that the SUBJECT ITEM(S)
or the forensic copy is not an instrumentality of the offense but
does contain data falling within the list of the items to be
seized pursuant to this warrant, the government either (i) within
the time period authorized by the Court for completing the
search, return to the Court for an order authorizing retention of
the SUBJECT ITEM(S) and/or forensic copy; or (ii) retain only a
copy of the data found to fall within the list of the items to be
seized pursuant to this warrant and return the SUBJECT ITEM(S)
and delete or destroy all the forensic copies thereof.  If the
search determines that the SUBJECT ITEM(S) or the forensic copy

does contain data falling within the list of the items to be seized pursuant to this warrant, the government may retain the SUBJECT ITEM(S) and the forensic copy without further order of the court.

6.    The special procedures relating to digital media found in this warrant govern only the search of digital media pursuant to the authority conferred by this warrant and do not apply to any search of digital media pursuant to any other court order.

## VI.  CONCLUSION

23.    Based on all of the foregoing facts, and my training and experience, I submit that there is probable cause to believe (1) that WELLS and MOORE violated 18 U.S.C. § 1591(a) (Sex Trafficking of Children); and (2) that the SUBJECT ITEM(S) are instrumentalities of violations of 18 U.S.C. § 1591(a) (Sex Trafficking of Children); 18 U.S.C. § 1594(a) (conspiracy); and 18 U.S.C. § 2423 (Transportation of Minors), and that evidence of the offenses, as detailed above in the list of "Items to be Seized" and Attachment "B," will be found within the SUBJECT ITEM(S).

/s/
_____
STEVEN C. WRATHALL
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me
on this 2nd day of May 2012.

**JEAN P. ROSENBLUTH**
_____
THE HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

<u>ITEMS TO BE SEARCHED</u>

The following digital devices are currently stored in a secured room at the Anaheim Police Station, 425 South Harbor Boulevard, Anaheim, California 92805, and are described as follows (hereinafter "SUBJECT ITEM(S)"):

      a.    Acer Aspire One Laptop, serial number LUSFS0D001143101207600;

      b.    Toshiba Satellite Laptop, serial number 1B597109Q;

      c.    Samsung SCH-R920 cellular telephone, serial number 99000028982677;

      d.    Huawei M865 cellular telephone, serial number T8U9MA1222014487;

      e.    AT&T cellular telephone, serial number Q4V7NB11C2604079; and

      f.    Samsung Cricket cellular telephone, serial number 268435460704060560.

## ATTACHMENT B

### ITEMS TO BE SEIZED

1.    There is probable cause to believe that the following SUBJECT ITEM(S), as stated in Attachment A, themselves constitute instrumentalities of the offense and should therefore be seized: Acer Aspire laptop, Toshiba Satellite laptop, Samsung cellular telephone, Huawei cellular telephone, AT&T cellular telephone, and Samsung Cricket cellular telephone.

2.    Based on the foregoing, I also respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of 18 U.S.C. § 1591(a) (Sex Trafficking of Children); 18 U.S.C. § 1594(a) (conspiracy); and 18 U.S.C. § 2423 (Transportation of Minors), will be found on the SUBJECT ITEM(S):

a.    Any records, documents, materials, and correspondence related to www.myredbook.com accounts;

b.    Any records, documents, materials, and correspondence related to advertisements on www.backpage.com or any other website offering online classified advertisements;

c.    Any records, documents, and correspondence related to the offering, requesting, soliciting, or transactions of any kind involving commercial sex acts, as defined in 18 U.S.C. § 1591(c)(1);

d.    Address books, names, lists of names and addresses and any written correspondence or records containing information

1

about minors who may have been recruited, enticed, harbored, or transported for the purpose of engaging in a commercial sex act, as defined in 18 U.S.C. § 1591(c)(1);

     e.   Address books, names, lists of names and addresses, and any other records, documents, or correspondence containing information about individuals that have requested, solicited, or entered into transactions of any kind involving commercial sex acts, as defined in 18 U.S.C. § 1591(c)(1);

     f.   Any records, documents, photographs, videos, or other materials that identify or refer to ERIC LAMAR WELLS a/k/a "Charlie," or TONISHA ALECIA MOORE, or any other individual as the user of any of the SUBJECT ITEM(S) subject to search pursuant to this warrant;

     g.   Visual depictions, photographs, images, or video of minors or young women who are unclothed, partially clothed, or posing in a manner that is sexually suggestive;

     h.   Any records, documents, correspondence, or receipts related to the purchase or reservation of airline tickets, train tickets, bus tickets, or rental cars;

     i.   Any records, documents, correspondence, or receipts related to the purchase, rental, or reservation of rooms at any hotel or motel;

     j.   Personal telephone and address books, including names, telephone numbers, and any other information stored in numeric or alphabetic form in the telephone and address books;

k.   Documents, records, and other data reflecting incoming calls, outgoing calls, missed calls, length of calls, or other information describing calls made or received by the telephone, including specifically the telephone numbers called, received, or missed; and

l.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show the actual user(s) of the digital device during the time period between January 1, 2012 and the present.

3.   As used above in subparagraphs (a)-(l) of the foregoing paragraph, the terms records, documents, programs, applications, and materials include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.  As used both above and below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: [central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data

(excluding analog tapes such as VHS), and memory chips; and security devices.

4.    In searching the SUBJECT ITEM(S) and in searching digital data stored on the SUBJECT ITEM(S), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The team of law enforcement personnel, which may include the investigating agent(s), and/or individuals assisting law enforcement personnel searching the SUBJECT ITEM(S) shall complete the search as soon as is practicable but not to exceed 60 days from the date of the issuance of this warrant.  If additional time is needed, the government may seek an extension of this time period from the Court within the original 60 day period from the date of execution of the warrant.

b.    The team searching the SUBJECT ITEM(S) will do so only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The team may subject all of the data contained in the SUBJECT ITEM(S) capable of containing items to be seized as specified in this warrant to the protocols to

4

determine whether the SUBJECT ITEM(S) and any data falls within the items to be seized as set forth herein.  The team searching the SUBJECT ITEM(S) may also search for and attempt to recover "deleted," "hidden" or encrypted data to determine, pursuant to the protocols, whether the data falls within the list of items to be seized as set forth herein.

       ii.  The team searching the SUBJECT ITEM(S) also may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       c.  When searching the SUBJECT ITEM(S) pursuant to the specific protocols selected, the team searching the SUBJECT ITEM(S) shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

       d.  If the team searching the SUBJECT ITEM(S) pursuant to the selected protocols encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT ITEM(S) pending further order of Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered , including how it was immediately apparent contraband or evidence of a crime.

       e.  At the conclusion of the search of the digital devices as set forth in subparagraph (a) above, any SUBJECT ITEM(S) determined to be itself an instrumentality of the offense(s) and all the data thereon shall be retained by the

government until further order of court or one year after the conclusion of the criminal case/investigation.

f.    Notwithstanding the above, after the completion of the search of the SUBJECT ITEM(S) as set forth in subparagraph (a) above, the government shall not access digital data falling outside the scope of the items to be seized in this warrant on any retained SUBJECT ITEM(S) or digital data absent further order of court.

g.    If the search team determines that any SUBJECT ITEM(S) is not an instrumentality of any offense under investigation and does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will as soon as practicable return the SUBJECT ITEM(S) and delete or destroy all the forensic copies thereof.

h.    If the search determines that the SUBJECT ITEM(S) or the forensic copy is not an instrumentality of the offense but does contain data falling within the list of the items to be seized pursuant to this warrant, the government either (i) within the time period authorized by the Court for completing the search, return to the Court for an order authorizing retention of the SUBJECT ITEM(S) and/or forensic copy; or (ii) retain only a copy of the data found to fall within the list of the items to be seized pursuant to this warrant and return the SUBJECT ITEM(S) and delete or destroy all the forensic copies thereof.  If the search determines that the SUBJECT ITEM(S) or the forensic copy

6

does contain data falling within the list of the items to be seized pursuant to this warrant, the government may retain the SUBJECT ITEM(S) and the forensic copy without further order of the court.

    5.   The special procedures relating to digital media found in this warrant govern only the search of digital media pursuant to the authority conferred by this warrant and do not apply to any search of digital media pursuant to any other court order.